IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN U. SINGLETON, M49404, | ) )  ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| G. LEPOSKY, LIGHTFOOT, GARCIA, KNIGHT, ABKINNS, HOWARD, JOHN DOES 1-4, EVINER, A. HARRIS, MORGAN, MS. LEWIS, ANTHONY D. WILLS, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Case No. 24-cv-1543-MAB

## MEMORANDUM & ORDER

**BEATTY, Magistrate Judge:**

Plaintiff John Singleton, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Menard Correctional Center, brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. (Doc. 1). Specifically, Plaintiff alleges that the defendants assaulted him on January 22, 2024, and were deliberately indifferent to his medical needs for months after the assault.

The Complaint (Doc. 1) is now before the Court[1] for preliminary review pursuant to 28 U.S.C. § 1915A.  Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims.  *See* 28 U.S.C. § 1915A(a)-(b).  Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed.  28 U.S.C. § 1915A(b).  At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed.  *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

## THE COMPLAINT

On January 22, 2024, Plaintiff was escorted to the medical building at Menard by members of a tactical team (unnamed correctional officers and a lieutenant).  Staff attempted to question him (he does not say what they asked about) but he refused to talk.  Based on his behavior, staff determined that Plaintiff should be placed on crisis watch in the North 2 segregation building. Plaintiff was escorted by the same tactical team members to segregation.  Plaintiff was uncuffed and he was placed in a bullpen.  (Doc. 1 at p. 8).  After a few minutes, Defendant Garcia spoke to Plaintiff about what size jumpsuit he wore, and he walked off to retrieve a jumpsuit.  Plaintiff noticed that Garcia made a detour to an office on his way to retrieve the jumpsuit where he spoke to other officers. (Doc. 1 at pp. 8-9).  After a few minutes "a c/o whose name" Plaintiff did not

---

[1] The Court has jurisdiction to resolve Plaintiff's motions and to screen his Complaint in light of his consent to the full jurisdiction of a magistrate judge and the Illinois Department of Corrections' and Wexford's limited consent to the exercise of magistrate judge jurisdiction as set forth in the Memorandums of Understanding between the Illinois Department of Corrections and Wexford and this Court.

know approached and directed him to strip down so he could be placed on suicide watch. (Doc. 1 at p. 9). Plaintiff then indicated he would not comply because he did not consent to being placed on suicide watch. The "John Doe" officer walked away and returned with an unnamed sergeant to further discuss suicide watch. Defendant Leposky stood in front of Plaintiff at the bullpen and threatened to deploy pepper spray if Plaintiff did not comply with orders.

Plaintiff noticed that 9 or 10 officers were converging on the bullpen. He indicated he did not want problems, and already had a bad back, so he did not want a fight. He claims the officers did not care and he was sprayed as Defendants Lightfoot, Abkinns, Garcia, Howard, Knight, Leposky, "and a few others" entered the bullpen and began to attack him. He claims he was slammed to the walls and then to the floor after he "put up a fight." (Doc. 1 at p. 9). His clothing was torn off and he was forced into a smock for suicide watch. (Doc. 1 at pp. 9-10). He was then taken to a cell and was not seen by medical staff for five days despite complaints about his back, possible broken ribs, and a dislocated shoulder. (Doc. 1 at p. 10). He claims there was a disciplinary ticket based on the allegation that he spit at officers, but he maintains he did not spit.

Plaintiff alleges that the first time he was seen for his injuries was January 27, 2024. (Doc. 1 at p. 11). He then provides a journal-style log of the medical care he sought and received from February of 2024 through July of 2024. The Court will not go through every day he mentions, but will highlight days when he explicitly sought care, or interacted with staff. On February 22, 2024, he recorded that he wrote mental and medical health about his needs and spoke to Lt. Bennett (a non-party) about his situation. (Doc. 1 at p.

11). On February 23, 2024, he was provided with naproxen pain pills for his complaints of pain, but he had yet to be assessed by a doctor. He alleges Defendant Nurse Morgan had put him in for an x-ray, but no x-ray had been performed. On March 4, 2024, he spoke to an unnamed nurse and was informed no order for an x-ray had been placed.

On May 22, 2024, Defendant Eviner said he had spoken to Nurse Louis[2] who informed him that two of Plaintiff's call passes had been cancelled but that he was next scheduled to be seen on June 4, 2024. (Doc. 1 at p. 11). Plaintiff alleges on June 1, 2024, he put in a sick call related to blood in his urine. On June 11, 2024, Defendant Nurse Lewis approached Plaintiff's cell with a urine test cup, and indicated he would be seen the following day about the results. (Doc. 1 at p. 11). Plaintiff was not seen for the promised follow-up consultation.

On June 12, 2024, Plaintiff gave Eviner a medication refill sheet, and it seems he also asked Eviner to submit a sick call slip for him. (Doc. 1 at p. 12). On June 13, 2024, Plaintiff caught Defendant Lewis's attention while she was on his gallery and asked why he had not been seen. He claims she made up an excuse for not seeing him sooner, and then retrieved the cup with his urine sample. Plaintiff next spoke to Lewis on June 15, 2024, when he caught a sergeant's attention during her rounds. She indicated she had already told him the results of his test were negative for blood (though she had not yet conveyed the results), and she indicated Plaintiff would be seen the next day. (Doc. 1 at p. 12). On June 17, 2024, Plaintiff submitted yet another sick call slip related to blood in

---

[2] It is not clear if this is actually Defendant Nurse Ms. Lewis, or if Nurse Louis is a different person. Plaintiff uses both spellings in his factual allegations, but only listed "Ms. Lewis" in the case caption.

his urine and a burning sensation while urinating. (Doc. 1 at p. 12). He became concerned that he may have an internal injury. Plaintiff spoke to Eviner about his difficulties securing care and informed him he had placed another sick call slip with Nurse Morgan. (Doc. 1 at p. 12).

In a supplement to the complaint, Plaintiff further explains on June 18, 2024, he put in what he characterized as his fourth sick call slip about extreme burning and pain during urination. (Doc. 14 at p. 1). On June 19, 2024, Plaintiff placed another sick call slip, spoke to Eviner about his need for care, and asked for another test cup because he did not trust the results of Nurse Lewis's first test. (Doc. 14 at 1-2). On June 23, 2024, Plaintiff submitted for a refill of blood thinners, and he was surprised to learn on June 24, 2024, he also got a refill of his naproxen. He hypothesizes that the pain medication was refilled to keep him from seeing a doctor or being assessed. (Doc. 14 at p. 2). On June 26, 2024, he asked an unnamed nurse about his situation to no avail.

On July 8, 2024, plaintiff submitted another sick call pass about pain while urinating and a strong odor to his urine. He also claimed extreme pain in his stomach. He repeated the sick call July 10, 2024. (Doc. 14 at p. 2). On July 29, 2024, Plaintiff was released from segregation and for two consecutive days he placed sick call requests. Finally, on July 31, 2024, Plaintiff received an x-ray. On or around August 1, 2024, he got x-ray results but did not understand them, so he sought follow-up advice. (Doc. 14 at 2).

Plaintiff seeks monetary damages, he asks that his situation be investigated, and that all defendants be fired and barred from future employment with IDOC. (Doc. 1 at p. 14).

Based on the allegations in the Complaint, the Court designates the following claims:

**Claim 1:** **Eighth Amendment excessive force claim against Defendants G. Leposky, Lightfoot, Garcia, Knight, Abkinns, and Howard for their alleged assault against Plaintiff on January 22, 2024.**

**Claim 2:** **Eighth Amendment deliberate indifference claim against Defendants Eviner, Morgan, and Ms. Lewis for their alleged denials of healthcare from January 22, 2024, through August 1, 2024.**

The parties and the Court will use these designations in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order is considered dismissed without prejudice as inadequately pled under *Twombly*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face").

### PRELIMINARY DISMISSALS

Plaintiff named John Does 1-4 in his case caption, but the Court is unable to tell from his complaint who these individuals are, or what they might have specifically done that caused Plaintiff harm. Plaintiff describes multiple different unnamed individuals throughout his complaint but referred to only one as a John Doe. (Doc. 1 at p. 9). In the single specific reference, he alleged that John Doe was one of the first individuals to ask him to strip down for suicide watch. John Doe then returned to the cell with an unknown sergeant and repeated the request. He says nothing further about what these two did. Even if it was obvious that these two were two of the four John Does listed in the caption,

these allegations alone are insufficient to state any sort of claim, because asking Plaintiff to strip for a suicide smock is not a constitutional harm.

Plaintiff also discussed three unnamed correctional officers and one sergeant as tactical team members who initially escorted him to healthcare, but this does not align with the John Does 1-4 who were all described as correctional officers, and again there is no harmful conduct associated with these individuals. It is also possible that John Does 1-4 refer to individuals present for the alleged assault, because Plaintiff says 9 or 10 officers converged on his cell, but only identified six by name. Even if this is what he meant, he did not describe the actions these four Does took during the assault, so the allegations are insufficient. The name John Doe can be used for a placeholder for an unknown defendant, but the Court must at least be able to tell what each individual Doe did that caused harm. As such, John Does 1-4 must be dismissed for failure to state a claim.

Additionally, Plaintiff named A. Harris (a correctional officer) and Anthony Wills (the warden) as defendants in the case caption, but he made no mention of them in the complaint. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). If a defendant is named in the caption of a case, but no claim is presented against that defendant in the body text, the claim may be dismissed without prejudice as to that defendant. *See Black v. Lane*, 22 F.3d 1395, 1401 n. 8 (7th Cir. 1994) (it is appropriate to dismiss a defendant if he is named, but there is no sufficient allegation of personal involvement). Therefore, Wills and Harris are dismissed without prejudice because there are no sufficient allegations against them.

## DISCUSSION

### Claim 1

An Eighth Amendment excessive force claim requires an inquiry into "whether force was applied in a good-faith effort to maintain or restore discipline, or [whether it was] applied maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The "core judicial inquiry" for an excessive force claim is not the severity of the injury, but whether the force used was 'malicious and sadistic.' *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

Plaintiff alleges that the incident began when he was refusing to strip down for a suicide smock at which point Defendant Leposky indicated he would deploy mace if Plaintiff did not comply. Instead of just deploying mace, Plaintiff alleges officers converged on his cell and started slamming him into the walls. He claims Leposky, Garcia, Lightfoot, Abkinns, Howard, and Knight were involved in the commotion. He mentions that he was then slammed to the ground when he "put up a fight." On the facts presented, Plaintiff's allegations are sufficient to proceed beyond initial review. Although there is a suggestion that some force may have been needed to gain his compliance, the need for some force is not a pass for any an unchecked amount of force. At this initial stage of review, the Court must read Plaintiff's complaint broadly and will make the plausible inference that the force applied may have been greater than necessary. Claim 1 may proceed against Defendants Leposky, Garcia, Lightfoot, Abkinns, Howard and Knight.

**Claim 2**

Prison officials and medical staff violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017). To state such a claim, a prisoner must plead facts and allegations suggesting that (1) he suffered from an objectively serious medical condition, and (2) the defendant was aware of the serious condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Generally, non-medical prison officials may defer to medical providers, unless they know or have reason to know that an inmate has a serious injury that is not receiving appropriate treatment. *Id.* at 527 (a non-medical official can be liable under the Eighth Amendment if they have actual knowledge or reason to believe prison doctors or assistants are mistreating or failing to treat an inmate with a serious need).

Plaintiff alleges that he believed Nurse Morgan ordered an x-ray for him in February, but that it never occurred, and that he later gave her a sick call slip but was not seen. As for Nurse Lewis, he alleges she brought him a urine test cup, but later lied to him about the results and prevented him from getting follow-up care or simply did not follow through. Given the volume of Plaintiff's allegations about his attempts to secure care, as well as the extent of the injuries he alleges, his allegations are sufficient to proceed against Nurses Morgan and Lewis as pled. It is not clear if the injuries from the assault and the later urinary problems are related, but for now the allegations may proceed in tandem.

Additionally, Plaintiff alleges that he frequently spoke to Eviner over the course of many months about his need for care because Eviner was an officer who worked five days a week on his gallery in segregation. It seems apparent from the allegations that Eviner knew Plaintiff had medical needs, and that he was also aware Plaintiff was entirely unable to secure medical visits. Although prison staff can generally defer to medical professionals, if they have reason to believe an inmate's serious needs are being ignored, they may be liable for not attempting to help. Here, Plaintiff's allegations are sufficient to proceed against Eviner on the basis that he had detailed knowledge of Plaintiff's constant requests for care, but it is not apparent he stepped in to render any aid.

One final thing is worth mention. On October 29, 2024, the Court received a letter from Plaintiff wherein he asked that Court filings be sent marked as legal mail, so that they are opened only in his presence. As the Seventh Circuit noted in *Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010), court documents mailed to the plaintiff are documents of public record, so there is no reason for the Court to attempt to ensure or direct that they be subject to some sort of confidentiality or protection. If Plaintiff was communicating with a lawyer about strategic matters, the situation may be different, but for Court correspondence, no such protection is appropriate.

## DISPOSITION

The Complaint states colorable claims in **Count 1** against G. Leposky, Lightfoot, Garcia, Abkinns, Howard and Knight; and in **Count 2** against Eviner, Nurse Morgan and Nurse Lewis. By contrast, Plaintiff has failed to state a claim against Defendants John

Does 1-4, A. Harris, and Anthony Wills. The Clerk of Court is **DIRECTED** to **TERMINATE** Defendants John Does 1-4, A. Harris, and Anthony Wills.

The Clerk shall prepare for Defendants G. Leposky, Lightfoot, Garcia, Abkinns, Howard, Knight, Eviner, Nurse Morgan and Nurse Lewis: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), the Supplement (Doc. 14), and this Memorandum and Order to these Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the Defendant, and the Court will require the Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk and shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order**.

Plaintiff is **REMINDED** that he is under a continuing obligation to keep the Clerk of Court and the opposing parties informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

The Clerk of Court is also **DIRECTED** to enter the standard HIPAA protective order in this case.

**IT IS SO ORDERED.**

**Dated: November 12, 2024**

/s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

## Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.